Case 17-4301, Cynthia Carpenter-Barker v. Ohio Department of Medicaid et al. Oral Argument, 15 minutes per side. Mr. Webster for the appellant. May it please the Court, I'm Jeffrey Webster on behalf of the appellant, Cynthia Carpenter-Barker, who's in the back of the courtroom with me, as well as Brian Pritikin who assisted in the brief and the actions that have led to us being here today. We essentially challenge the state's use of an annual assessment process seven times in the past seven years to consistently propose to reduce the private duty nursing or PDN services that Megan has required in order to sustain her life. The interesting aspect of that is from 2012 to 2013, the use of this assessment tool produced a proposed reduction from 126 to 56 hours, and more recently from 128 hours to zero using the same tool. It would appear to be somewhat in fluctuation. Six of these matters, while all seven were appealed, the decisions, all seven were appealed, one of the first ended up in court and resulted in a settlement agreement. Interestingly, when the other six were presented on appeal to the state agency's hearing officer, they decided that the agency was incorrect. Most recently, in 2017, the decision was made. In 2018, we've not seen an assessment done in spite of the regulation that it be done on an annual basis. So that sort of raises for me the question of whether the appropriate remedy for adverse determinations is really going through the normal appeal process, which is an administrative process within the state, and then going to the state courts. What makes this case different from a normal individual denial of benefits kind of case that would go through those standard processes? I think it's a very fair question. It kind of gets to the root of the issue. Megan has a birth defect, and in spite of the initial prognosis that she would not live beyond two years, she's now 31 years old. Her condition has never changed and will never change except that it will perpetually decline. Yet we find the state taking exactly the opposite position using this process. At the point it becomes that you get a decision that the state, from its own agency people, that the state adopts and accepts, and then a week later they turn around and propose to reduce the services again, and the cycle starts all over again, and you win that appeal. And then the state a week or a month later proposes to go right back where they were. They refuse to abide by their process and the decisions that they make consistently year after year after year. At that point it becomes discrimination. But are there hearings in between? Yes. If the state wants to reduce it, then there's a chance for a hearing? There's a chance for a hearing. And then the doctor says she needs more, and so then they have another. Interestingly, her treating neurologist has treated her since birth. Right up to this day has treated her since birth. So in terms of the deference that the lower court found in giving to the administrative agency seems contrary to Olmstead. So if I can understand, then, if we were concerned about any and every individual who does not get the benefits that they think they deserve filing an Olmstead type of lawsuit, your answer is no, that's not going to happen because what we have to take into account here is the track record of the state here. It's an annual review that they mandate in the state, but each time they're trying to reduce the benefits where the record is that she has been stable or declined, not gotten better. And so at some point for an individual, there comes to be an Olmstead problem that they can sue on in federal court citing Olmstead. But for the first year, there wouldn't have been an Olmstead problem. I don't think so. I think here when you propose to reduce the PDN, the private duty nursing services, to zero, which was the most recent one, clearly since they waived the fundamental alteration defense, the only place that it's possible for her to receive that level and scope of services is in an institution. And we know that Olmstead says no. We know that the Department of Justice's regulations say the least restrictive environment. So at that point, there's actionable discrimination. It's interesting to me that the trial court ignored Olmstead's mandate that there is no comparative class review or comparison class. He noted there was no comparison class offered. While we're not required to, Olmstead very clearly, the Supreme Court rejected the idea with the statement, the state's argument in Olmstead was that there was no discrimination by reason of disability because there was no comparison class identified with preferential treatment. In one sentence, the Supreme Court said, we're satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA. That's at U.S. 599. So it just outright said, no, that doesn't work. But interestingly, in the judge's decision at page 15, while opening up that we didn't offer a comparison class, the judge says, ODM has not determined that individuals with seizures should not receive 128 weekly hours of PDM. It has merely determined that Megan, in italics, should not. Is that not identifying a comparison class that the court, at the beginning of its opinion, faulted us for not providing a comparison class? The judge stated there's one. And quite clearly, there is. But the point is, the Supreme Court said that's not required. What is required, and I think it's in the majority opinion in Olmstead, but in addition, Justice Kennedy, with Breyer concurring, said the opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference. That would be Megan's neurologist, not the physician, excuse me, that the department utilized, who has never seen Megan and has never treated Megan. That's not the majority opinion in that case. No, the majority opinion states, the state may rely on the reasonable assessments of its own professionals. That's at page 603. But interestingly, in Olmstead, the treating professionals were state employees. The two defendants in Olmstead were being treated in a state institution, so both of the ladies, treating professionals, were state employees. In our case, the treating professional, and under the Medicaid program, the program is administered by private practitioners. And under federal law, and I can't give you the site off the top of my head, there is free choice of provider. As long as somebody has a Medicaid provider agreement, it's the beneficiary or the recipient that chooses who that's to be. That's the treating professional who has never wavered and has never varied from his requirement that the private duty nursing aspect is a critical component. The state has been dismissive, as well as the lower court, in defining this as a case about seizures. When you look at the record, the neurologist specifically identifies that her condition is mitochondrial encephalopathy, along with a whole lot of other things and diagnoses. A symptom... There's no question that she's in terrible shape. There's no question that she's in terrible condition. Very handicapped, no question. There's no question. But interestingly, the continued reference to seizures, seizures, seizures, it presents itself here as a symptom of mitochondrial encephalopathy. That is not the condition that this issue that we're revolving about in appeal. The state minimizes it as, well, it's seizure activity. It really isn't. Since she is incapable of speaking, the reason you have a requirement for a private duty nurse is really quite simple. Anybody can pop a pill in someone's mouth. The importance of a nurse is to look at the patient before the administration to determine is it needed, because these are PRN medications, to be utilized as needed. And after the administration, has there been an adverse reaction? In this case in particular, the nurses have testified by affidavit that often you have to look at her eye movements because she can't speak. So you need a trained professional to look and observe at how is she presenting to determine what type of seizure is she having. And post-administration, did it work? It's not like you can look and say, well, Megan, how has that affected you? She can't answer. The PDN is for either a registered nurse or an LPN, is that right? Yes. Why could not ñ and my understanding is that she has aides who are not nurses but are a lower level of skill. Why could an aide not be trained to do the same thing that an LPN or RN would do? Because Ohio's Nurse Practice Act prohibits it. Because of the type of medications and the requirement that the medication dosages be mixed, and then there would be an exercise of professional nursing judgment to determine the PRN aspect, is it needed? So would a parent not be able to do this? I don't ñ if they were a nurse who had the training to be able to do it. A non-nurse or doctor parent. Well, state law prohibits a non-nurse from exercising nursing judgment and specifically prohibits if the physician's order is written to state that skilled nursing judgment is required, state law prohibits an untrained medication aide, which are present in the Medicaid program system of delivery of services, prohibits them from administering that medication. The state continually proposes that they can use these aides, but in point of fact, under their regulations for Medicaid it permits it, but under the regulations and the statutes under the Nurse Practice Act, those aides are prohibited from administering these types of medications. And my understanding of the record, and correct me if I'm wrong, is that she is in a workshop-type setting for 40 hours a week? Yes, and that's why the 128 hours ñ originally it was a hundred and ñ 168. Right. 168 is the number of hours in a week. So it's ñ that service is provided in the workshop. So that is where my question was going. Is she attended to by an RN or an LPN in that workshop? It's my understanding, yes, that she is. And that's why that reduction essentially was ñ it's kind of a moot point in terms of what she receives and what her needs are. I think it's really quite simple that when we look at a proposal that obviously the state's intention is to reduce these to zero, in point of fact, they're proposing institutionalization, and Olmstead and the Department of Justice regulations are quite clear. Institutionalization is discrimination when there is an alternative, and by their waiver of the fundamental program defense, clearly she can receive these services where she is, and she's entitled to do that. And to propose otherwise is to discriminate. We have to make that inference because their position is the same on every annual review. Yes. So we infer their intent to institutionalize her from their consistency of positions. That's how we get there. Seven times in a row it has been to take it away when her condition is the exact opposite of what would support that conclusion. And in point of fact, she will never get better. Okay, so the other part of Olmstead, I think, was that it requires an individualized assessment. I thought you argued that as well, but it appears to me like there is an individual assessment. You just disagree with it. Well, it's an individual assessment, but there's nothing rational that supports the results of the assessment. Okay. Simply nothing supports it. Show us if she gets better. All right. So an individual assessment that's not rational would be a Olmstead violation? Yes. Okay. Because the only source left is institutionalization, and that's prohibited. Thank you. Thank you. May it please the Court, my name is Catherine Bockbrader for the Department of Medicaid and its director. I first want to point out it is absolutely not true that the Nurse Practice Act prohibits certified medication aids from prescribing the medication here. When the legislature created this provision, they directed several agencies, including the Nursing Board and the Department of Disabilities, to get together and develop rules to allow these certified medication aids to practice. And they got together, they developed rules in both under the Nursing Board and under DODD to decide what nursing tasks can these people safely perform, what medications can these certified aids safely administer, what training do they need. Those rules all set that forth, and the Nursing Board's rules specifically have an exemption for these types of people in a DODD. So you're saying that your opponent is mistaken when he says that other people cannot administer medication for the plaintiff if they're trained but not an LPN or an RN? In this particular circumstance, yes. The Nurse Practice Act and their rules, which are in Chapter 4723, provide an exception which relates to the regulations here which allow the certified medication aids to provide this service. And those require they have specific training, they must pass examinations, and they can never administer any medication to an individual unless they receive specific training on that individual. So no one would be allowed to administer medications to Megan unless they were trained on Megan. What are the orders for her? What do her seizures look like? How does she respond to medication? What do you need to look for after you receive that medication? They would never be able to do that until someone trained them specifically on it. So has her aid or have her aids been so trained? The hours have never been reduced. So currently she is eligible to receive 128 hours of PDN. The undisputed evidence shows there are times when the nurse is not present. They're not utilizing all those 128 hours, but they are available. So because of the stays that have been in place in this case and administratively, it's never actually been reduced. And can you give us the exact set? You said Chapter 4723? Of the administrative code. The administrative code. I'm sorry, I do not have that exact site. But it would cite to the Department of Developmental Disabilities in the exception. And here, again, you're talking about orders that are for a particular dose, for a particular medication, in a particular time order or time interval. What about your opponent's argument that you have to know about the eye movement and be able to adjust accordingly? Well, as you indicated, these certified aids would not be allowed. They would be trained in that. They would be trained to look for eye twitches, to look for eye movement, to look for other types of muscle twitches to show that myoclonic activity. So they would have to be trained on that specifically for her. And, again, the legislature, the nursing board, the Department of Developmental Disabilities have all determined in their rules that it is appropriate, and this happens every day in Ohio, that these types of aids give this type of medication to people with similar conditions. And there's no discretion there. And regardless of whether it's a nurse or an aid, neither one of those practitioners can modify the physician's orders. So if a nurse thinks for some reason there might be an interaction, they can't simply choose not to administer medication. They would also have to contact the doctor just as the aid would. So there's no distinction there. Can you raise your voice just a little? I'm not catching everything. I'm sorry. They would have to receive that training before they could provide the medications on her specific symptoms. And the 2014 Administrative Appeal Decision held that ODM could reduce its hours only after the aids are trained and in place. And ODM, of course, has no problem with that. It was never the intention to leave her without supervision, to leave her without care for any part of that time. It's simply to replace some of that time with different practitioners. So going back to the initial set of questions I was asking your opponent, why shouldn't there be an ability of someone, an individual, to bring an Olmstead-based claim based on repetitive denial of benefits, on the theory that it's not just a one-time thing, but it is an effort shown objectively for the Medicaid state to force the person into a less costly institutionalization rather than the more costly PDN? Well, there's no Olmstead case that has ever held that repetitive decisions equal discrimination. And to be clear, in the cases, the administrative appeal cases that Megan did bring, between 2011 and 2014, those cases were remanded back because of concerns about whether the aids were actually authorized to administer these types of medications, whether they were trained, whether the county would allow it. So those were all remands to gather more information. There was never a finding that this is absolutely a bad decision, this should not be allowed. It was to gather more information about the law and about what is actually practically available for her. And those were the three decisions from 2011 to 2014. But doesn't this raise, you know, we have fact questions and we have law questions. As a matter of law, if a state were repeatedly denying people daily nursing, and the only place that that person could get adequate treatment would be then in an institution, why wouldn't that be the guts of an Olmstead claim? That then we could, you know, say, well, we need to develop the evidence and we'll see whether or not it was really just being denied because of a lack of proof by the patient of appropriate nursing care or some other reason, as opposed to a discrimination and an avoidance of the mandate to deinstitutionalize people. Well, denial does not equal discrimination. There are many objective reasons and many objective considerations that ODM took into account when it decided this. And they didn't decide this for a group of people. They decided it for Megan. There's no claim that ODM, there's no... So if ODM decided hypothetically that for the class of people who have constant seizures, we are not going to provide daily nursing care, would that be an Olmstead claim? That could be, but the evidence here, the undisputed evidence, is ODM does provide continuous PDN to some patients in Ohio who have seizure disorders. It's simply, they've simply denied it for Megan because of their considerations of the frequency of the seizures, the type of treatments that she receives for them. Those are certainly reasonable bases that don't constitute a discriminatory reason. Did that change year by year? I mean, it bothers me that Megan's condition has deteriorated throughout this period, but your client continues after every annual review. They deny it again, and they appeal the next one. I mean, is there something of Megan's condition that changes year by year? You said there could be objective factors that support the denial. What objectively changed from year to year with Megan's condition? Well, first of all, the decisions, the state is required to do an annual review. I know that, but then you do it and you deny it again without accepting the prior determination. I can understand that you do an annual review, but they want us to infer a motive to institutionalize her because there's no reason to have a different decision year after year after year. Tell me, what is the difference? Well, the decisions aren't different. It was the same attempt, and as I said, the decisions that they prevailed on were not that it was an inappropriate decision, but merely that it needed to be remanded to gather further information, and that's what happened. So they attempted to go back, get that information from the county, show the law to the hearing examiner to explain, and eventually in 2014 the administrative appeal decision agreed that it was legal, that it was authorized, that the county would assist with finding these people for Megan. So that was an administrative appeal decision, but then wasn't that appealed? That was appealed to common pleas court, and that is also an option short of coming to federal court and arguing discrimination. Right, and so then it went to common pleas court, and was that where there was a settlement for 2014? There was a settlement, correct. So essentially it seems that's feeding into your opponent's argument that really every year the state is trying again and again and again to limit her hours, and yet her condition is not improving. It's getting worse. And I think one of the issues, well, going way back in time, these hours didn't used to be required to be prior authorized. They were usually generally granted, and the testimony of Nurse Henson was that when she started there was only one nurse for the entire state of Ohio that reviewed these PDN claims. So you can imagine they probably were not very thoroughly reviewed. When that started to happen and there were people who could appreciate that, it was determined that most of the tasks that are done for her are not nursing tasks, they are daily living tasks, and also since 2003 there's the availability of the certified medication aids. And they also indicated that the hearing examiner at one point found it, and ODM also had the position that because the family had been used to receiving 128 hours, they would reduce it gradually so the family could adjust to this new situation and gain a comfort level with that without going from 128 to zero. So that was why the reduction happened at various points. But it actually never got reduced because of all the stays that were in place. While she is appealing, those hours can be stayed and not reduced, and that's what occurred here. Okay, so to answer my question, why should we not draw a reasonable inference that the repetitive denial is motivated by your desire to institutionalize Megan? Because you can see that ODM reviewed hundreds of pages of documents. They relied on the opinions of multiple nurses, of a physician with 25 years of experience dealing with patients with seizure disorders, and they relied on those statements. Contrary to what Megan's attorney has said, there is a lot of objective evidence that ODM looked at that goes to the fact that she does not necessarily need 128 hours of constant nursing services, and she in fact, the record shows, does not receive those. She is in 40 hours at the lodge, and she has times at home where she does not have a nurse available. So was this decided on summary judgment? I can't remember. Yes. So why isn't there at least a fact question that would warrant a trial to decide whether or not the inference that the purpose was institutionalization is correct or not? There is a fact to dispute as to whether these are medically necessary. Obviously the parties disagree about that. And if she had appealed that to a state court, that would have been the issue that she could have argued. But she has chosen to bring a federal lawsuit based on discrimination, and in order to defeat summary judgment, she was required to come forward with some evidence of discrimination. And no court has ever held that an individualized determination of need constitutes discrimination. The district court pointed to it. So it has to be, in your view, it has to be class-based? It can't be an individual determination of need. Well, what could it be then? Well, the district court pointed out that all the cases that he cited involved a categorical distinction that relates to the difference between home care and institutional care. So, for example, in Fisher, the state had a policy of approving or they authorized unlimited prescriptions in institution but only five prescriptions in home care. They didn't make any determination. In fact, they never made a determination that the plaintiff only needed five prescriptions. They just simply determined as a blanket basis we're only going to cover these. That's not what occurred here. ODM made an individual determination that Megan just simply didn't need that many hours of nursing services based on the review of all the evidence that it had before it. Suppose, I'm making up something at the spur of the moment, but suppose that ODM decided that we're not going to provide a ventilator to a particular person in the home because it's too hard for everybody but we'll provide a ventilator in an institution. That's an individual decision. Would that be something that would trigger an Olmstead review? It might be, but that's not what occurred here. ODM is saying these services aren't authorized no matter what location she is in. She does not require PDN, 128 hours of PDN services, regardless of where she is. What does she get in the 40 hours in the workshop? There is a nurse on site, but it is not a one-on-one nurse dedicated to her. That's, in fact, one of the so-called benefits of institutionalization is that you get to share the staff over a group of patients, right? Correct. Because in most instances other than ICU, I'm not familiar with one-on-one nurses in hospitals, for instance. These certified medication assistants, which is what ODM has proposed for her, are not just available in the home. They are also available in other DODD-type facilities that might compare to a nursing home, but they don't have nurses there either. They have certified medication aides, so they're not making a distinction between home versus other types of facilities. What does a certified medication aide do other than give medication to a person in a home? Depending on their certification level, there are two different levels. They can do the typical daily living tasks, such as dressing and feeding, et cetera. They can administer oral and topical medications. They can do tube feedings. They can clean feeding tubes and things of that nature. They cannot change them. But if they have a higher certification level, they can do certain things such as that. Any other questions? No. Thank you very much. Thank you. I'll be very quick. The difference between using a medication aide is when we look at it, and this is in the footnote 4 in our reply brief, if you look at Administrative Code Rule 5123, colon 2, dash 6, dash 06, parens XX, close, it finishes with what a limitation is to PRN medication, which is the as needed, the determination. Unless the order is written with specific parameters which preclude independent judgment, every order written for administration of medications to Megan has consistently, throughout her entire life, required and been within the context of this. So these medication aides cannot provide medications to her. And for the department to advocate that, well, there's not really a lot of difference. Well, the real difference is when we look at the Justice Department at 28 CFR 35.130 parens D, the agency shall administer services in the most integrated setting appropriate to needs. That's where she is. She's in home. But when I look at Olmstead, it's not a class action. Two people, two residents of a state institution in Pennsylvania filed a lawsuit. The Supreme Court said they presented viable claims trying to get out of the state institution because it was that the discrimination results from putting them in a less integrated setting. So my hypo of the ventilator and denying someone a ventilator at home and saying you can be on a ventilator only in the hospital or a nursing home or institution would be an example of an Olmstead decision, even if it's on an individual basis for the first time. You wouldn't have to have the history. Just like Olmstead. Those are individual decisions in Olmstead that the Supreme Court reviewed. And the danger of saying that it can only be in a class or a broad-based, so if I only deny her her constitutional rights, that's okay, and the court won't hear it. And if the next morning I deny her constitutional rights, you won't hear it because it's happening one by one. When you look at it in the Constitution and in the statutes, it's person. A person is entitled. That's what makes this place great. It's what this republic was founded on. I have rights. There's nothing that requires this. And I don't think that's what the lower court was trying to say when he said we didn't identify a comparison class. I think what he was trying to get to was something else. I'm not sure exactly what it was. When you first read it, it's like, well, it can only be a class action. Well, if I'm the only plaintiff or if I file a class action, my claims have to be typical of the whole class. And the relief is accorded to me, and that benefit is then extended to the class. It's still an individual action. I have to prove typicality. That's the nature of Rule 23. This thing that it can only be a class is just wrong thinking. Thank you, Your Honor. Thank you both for your argument. The case will be submitted when the clerk calls the next one.